EVANS v. CARTER. (No. 770.)

(Court of Civil Appeals of Texas. Amarillo. May 1, 1915. Rehearing Denied May 22, 1915.)

1. TRUSTS ⬅44—EVIDENCE—JUDICIAL SALE.

In a suit to recover a share of the profits realized from the sale of land bought at a judicial sale, evidence *held* not to show, as a matter of law, that plaintiff had authorized defendant, who was a co-owner with him of notes secured by a second vendor's lien, to protect his interest at the sale so as to entitle him to share in the profits.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 66–68; Dec. Dig. ⬅44.]

2. PARTNERSHIP ⬅96—PURCHASE OF PROPERTY BY PARTNER—JUDICIAL SALE.

Where one partner purchases at a judicial sale land sold on foreclosure of a partnership lien, that purchase does not inure to the benefit of the partnership, but the land may be held by the purchaser for his individual benefit, if the purchase was made openly and without any agreement to stifle competition in bidding.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 144; Dec. Dig. ⬅96.]

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**2.** CONTRACTS ☞130—VALIDITY—AGREEMENT WITH PURCHASERS AT JUDICIAL SALE.

An agreement between two parties that one shall purchase the property at a judicial sale and sell it to the other does not necessarily render the sale illegal; but, if the agreement was entered into to stifle competition and to prevent the property from bringing a fair price, it would be illegal.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 654–658; Dec. Dig. ☞130.]

Appeal from District Court, Randall County; J. N. Browning, Judge.

Action by H. Y. Evans against S. G. Carter. Judgment for the defendant, and plaintiff appeals. Affirmed.

Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellant. Gustavus & Jackson, of Amarillo, for appellee.

HUFF, C. J. The appellant, Evans, brought suit against the appellee, Carter, alleging that some time prior to October 14, 1912, appellant and appellee brought suit on four vendor's lien notes, of which they were joint owners, and which were for the purchase price of sections 11 and 22, in block No. 6, International & Great Northern Railway lands. We do not state accurately the amount of the lien retained on each respective tract, but make the above statement for brevity, and which notes amounted, principal, interest, and attorney's fees, at the time of the rendition of the judgment, to $2,631.69. That the suit was prosecuted to judgment in the district court of Randall county against various parties, which are unnecessary to name, and that judgment obtained thereon, together with the judgment in favor of Mrs. Adelina Angle, on her plea of intervention; the decree providing: First, that out of the sale of the property, payment should first be made on the cost of suit; second, to the judgment of Adelina Angle, amounting to $4,238.64, with interest from the date of the judgment, with 10 per cent. interest from the date thereof; and, third, in favor of H. Y. Evans and S. G. Carter, the amount adjudged in their favor, $2,631.69, with 8 per cent. per annum from date of judgment. That thereafter an order of sale was issued on such judgment and the land sold thereunder the 1st day of April, 1913. It is alleged that during all the proceedings appellant was residing in the central part of the state, and that the handling of the suit of such partnership interest and property was left to appellee, Carter, and that it was agreed and understood between appellant and appellee that Carter should look after and manage said suit and said property for the joint account and mutual benefit of Carter and Evans, and that in pursuance of such agreement, Carter for himself and Evans attended such sale to protect their joint interest and make bids upon the property and such disposition of the property as would best serve the interest of the parties; that Carter appeared and bid upon the property, but did not faithfully represent the joint and mutual interest of the parties as in law and good conscience he was required to do, but so contrived to manipulate the sale as to defeat and defraud Evans of his right in said note and property and appropriate the same to his own use and benefit; that at the sale there were purchasers who were willing to bid the approximate value of the property, among whom was one Boulware, and that by private and secret understanding between Carter and the said prospective purchasers, and especially with Boulware, Carter arranged so that he might purchase the property at the smallest figure possible, sufficient to cover the costs of suit and sale and the prior judgment of Adelina Angle, agreeing that he would take the property in his own name and thereafter convey it to the purchaser; that such agreement was a breach of trust on the part of Carter, and a scheme to deprive Evans of one-half the proceeds of sale, and in pursuance of such scheme Carter proceeded and prevented other persons from bidding on the land at said sale, and especially preventing Boulware to bid on the land; and he himself bid thereon and secured a sale of the property to him, bidding therefor the sum of $4,550, and took a sheriff's deed to such property in his own name, and not in the name of Carter & Evans, as in law and equity he was required to do; that of such sum so bid, $52.10 was paid as original court costs, $90 as sheriff's costs, and the sum of $4,394.05 was applied to take up the prior judgment of Angelina Angle, and the remainder, $13.84, was divided equally between appellant and appellee, and that $6.92, so appellant was informed, was on deposit with the clerk of the district court or the sheriff of the county; that immediately after the sale, Carter conveyed the premises for $6,500, or at a profit of $2,000, to Boulware; that had Carter in good faith performed the trust imposed upon him and controlled the disposition of the property and proceeds of sale for the mutual benefit of the parties, as he should have done, he would have remitted one-half of such proceeds to appellant, instead of fraudulently appropriating it to his (Carter's) own use, by reason of which appellee, it is stated, is indebted to appellant in the sum of $1,000.

Appellant alleges that if Carter did not in fact have a previous agreement and understanding with Boulware, or other prospective purchasers, as above alleged, then he says that Carter knew, at the time he bought such property, that such a sale could be made, and that he had previously arranged for such sale and had ascertained the name or names of such purchaser or purchasers, and in violation of the trust imposed upon him and in fraud of appellant's rights, and that he did immediately sell the same for a

profit, as above alleged, and appropriated the entire profits to his own use, to appellant's damage in the sum of $1,500. He prays for judgment for his damages, interest and costs.

"Appellee answered, admitting the joint ownership of the notes, but alleged that they were second lien notes and subject to the prior outstanding notes against the land. Appellee denied that he was acting for appellant in bringing the suit, and set up that long prior to October, 1912, appellant and appellee had ceased to act for each other in any affairs in which they were jointly interested, and that appellee did not assume to act for appellant in suing upon the notes, but that each was acting independently of the other; that appellee employed the attorneys bringing the suit to sue for and collect his interest only in the notes, but gave his consent that the attorneys might communicate and arrange with all other proper parties; and that appellant was not a lawyer and did not know how the pleadings should be drawn, or what legal proceedings were had in handling the suit; that after the judgment and before the sale, appellee, on account of the prior lien, communicated with appellant and sought his co-operation and assistance in protecting their joint interest, but appellant wholly failed to respond. Appellee denied making any arrangements or perpetrating any fraud in reference to the sale of the land, but that he bid at the sale for himself and in protection of his individual interest and became the purchaser of the land which he sold, making a profit of $1,427.15."

The facts show that some time prior to the execution of the notes set out by appellant, H. Y. Evans and Carter had some sort of business association or agreement. Mr. Evans had what was known as the International & Great Northern blocks of land for sale, and there was an agreement that Carter should sell the land, and they would divide the profits equally. There is some evidence to the effect that the two sections of land mentioned in the petition were sold to Mrs. Cleve of Potter county, and that she executed the vendor's lien notes for which judgment was obtained, as set out in the petition. These notes were executed to the owners of the land, who afterwards transferred them to Mrs. Angle, and who sought a foreclosure by plea of intervention in the suit mentioned in appellant's petition. The relations of Evans and Carter continued friendly up until some time in October, 1911, when, owing to some misunderstanding in an attempted settlement, there appears to have been an estrangement and no communication between the parties, except perhaps one phone message and a postal card. The notes upon which appellant bases his right of action were made payable to H. Y. Evans and S. G. Carter, or their order, by one Kirk, who appears to have purchased the land, just from whom or how is not disclosed, and they were second lien notes; Mrs. Angle's notes being a prior lien indebtedness. After Kirk obtained the land it appears that he executed a deed of trust to a trustee to secure several named commercial companies scattered over the United States. Carter wrote some letters to Evans, with reference to the matter, but received no replies, and finally approached S. H. Madden,

of the firm of Madden, Trulove & Kimbrough, a firm of lawyers in the city of Amarillo, with regard to the matter, and requested him to bring a suit to establish and collect his interest in the notes against the land. Upon an examination of the condition of the title and records and other facts, Madden advised Carter that it would be necessary to make all parties having an interest in the land parties to the suit. It seems that Madden wrote a letter to Evans, finally locating him in Oklahoma somewhere, and that Evans wrote him to proceed with the suit, and that whatever he and Carter did about the matter would be all right. Madden instituted suit on the notes in the name of H. Y. Evans and S. G. Carter, making the trustee in the subsequent deed of trust, Kirk, and various other parties, parties to the suit. Afterwards, and before judgment was obtained, Mrs. Angle intervened, setting up her notes as a prior lien, and upon hearing judgment was rendered, decreeing her note a prior lien, and decreeing Evans and Carter's notes second liens and the parties in the deeds of trust given by Kirk as third lienholders, ordering the sale of the land. An order of sale was issued in accordance with the judgment, and was advertised to be sold some time in February. Carter wrote a letter to Evans of the date of the sale, but received no reply. For some reason, the sale was not had at that date, and the land was readvertised, to be sold the first Tuesday in April, 1913. Carter again wrote a letter to Evans, notifying him, and requested that they get together and talk over the matter, lay aside their differences, if any, and see if they could not arrange so as to protect their interest. Evans did not answer this letter, and paid no attention to it. In one of the letters Carter stated that it might be necessary in order to protect their interest, to arrange and procure money to pay off the prior lien. It seems that Carter made some effort to get others to buy the land and pay off the indebtedness, but was unsuccessful. He stated in one of his letters to Evans that he thought he had a man who would purchase the land, but that he did not know whether he would do so or not; and there are some facts that would indicate that Madden notified Evans of the date of sale, but he appears to have done nothing with regard to the matter, and was not present at the sale of the land. Carter says that he had spoken to a Mr. Smith, connected with the National Bank of Commerce of Amarillo, and that Smith had verbally promised to assist him if necessary; but further than that there appears to have been no arrangements made to obtain money to buy in the land on the morning of the sale.

There is some evidence in the record to the effect that S. H. Madden had agreed to furnish the money to buy off Mrs. Angle's judgment, and had drawn up a transfer of the same and sent it to some party at Austin,

who appears in some way to have been representing Mrs. Angle, and the testimony is not very definite as to what had been done with reference to the matter. There is some testimony to the effect, however, that the transfer, together with a draft from those parties, was then in the National Bank of Commerce of Amarillo, and which draft was drawn on Madden and Carter, for the amount of the judgment. Carter testifies that he attended the sale, but before doing so called on Mr. Madden, and notified him that he was going down to attend the sale, and that he would bid on the property, and that if he bought it in, he would buy it in his own name; Madden denies this. When Carter went to Canyon City, in Randall county, where the sale was had, he met the sheriff, and told him that Madden asked him to postpone the sale and to phone Madden at Amarillo. It appears that Judge G. A. Brandon was representing Mrs. Angle at the sale, and says that Carter, on that morning, told him that Madden had bought her judgment and said that Carter told him that Madden represented his client, and requested him to phone Madden; that he did phone Madden and there was some sharp colloquy between the parties over the phone, and Brandon refused to postpone the sale, but demanded that it proceed; that he had a letter and wire from parties at Austin, who were representing Mrs. Angle, and that he was directed to sell the land, and that he would not recognize the right of Madden to control that judgment until he got the money, etc., or something to that effect. The sheriff simply testifies that Carter requested that the sale be postponed, stating that Mr. Madden had so requested, and asked them to phone Madden in regard to the matter. There is some conflict in the testimony as to just what was said between the parties with reference to the sale at that time. Madden had not paid the draft at the time, so far as the evidence shows, for the judgment, but had sufficient money to have done so, or could have obtained it readily.

The testimony discloses the fact that Mr. Boulware owned a place adjoining the sections of land for which the notes were given and which were sold, and that some time previous to the institution of the suit, he had made an effort to purchase the land, but, owing to the condition of the various liens, they were unable to close the deal. The evidence discloses the fact that he was desirous of purchasing the land, and that he was present on the day the land was sold at sheriff's sale. His, and Carter's, testimony is to the effect that he did not attend the sale for the purpose of buying in the land, but had declared that he would not take the sheriff's deed to the land, but that if he purchased the land, he must have a warranty deed, together with a clear abstract showing title, and he says it was not his purpose to bid for the land, and that he would not have done so, and did not attend for the purpose of bidding in the land, and never intended to bid it in at the sale, but that his purpose was to purchase the land from any one purchasing at the sale, provided he could get a warranty deed, with a clear abstract of title. The evidence in this case discloses the fact that Carter had requested Evans to assist him in obtaining an abstract to the land, which it appears Evans did not do, but that Carter, at some time, just when is not disclosed, did obtain two different abstracts on the land. Several parties were present at the sale of the land, and after the sheriff refused to postpone the sale at the request of Carter, and after phoning Madden, the land was sold. Both Boulware and Carter testified that there was no agreement between them that Boulware should not bid at the sale, but that he had declined to do so and refused to do so, and all of the witnesses who attended the sale and were placed upon the stand declared that no one requested them not to bid, and they heard of no such request being made, but that the sheriff, in crying the sale, called upon all to bid, calling on some personally to bid. There were two bids made on the land; Brandon made one bid to cover Mrs. Angle's judgment, and Carter raised his bid a small amount on each tract of land, substantially for the amounts as set out in appellant's petition. After bidding on the land and after it was struck off to Carter, the sheriff made out a deed to Evans and Carter, without consulting Carter as to whom the deed should be made; that Carter and no one else had instructed him, and nothing was said about it at the time the bids were made; he simply supposing because of the style of the suit that Carter was buying for both. Carter refused to take the deed as so executed, but told the sheriff that he was buying the land for himself, and that he wanted the deed made to him direct, which was done. On the same day, possibly in the afternoon, after the sale was made, Carter sold the land to Boulware for $6,300 cash. Carter paid the sheriff the amount bid by him by a check from Boulware to Carter, and indorsed by him to the sheriff, which the sheriff accepted in the payment of Carter's bid. The sheriff says that before the hour of the sale he met Carter and Boulware, and Carter showed him a check and asked him if it was good and if he did not think so to phone to the bank at Amarillo; that his check would pay the sum bid. This, perhaps, is sufficient statement of the facts, but in discussing the case, if necessary, we shall refer to other facts established by the verdict of the jury, necessary to illustrate our holding. The jury rendered a verdict for appellee, upon which judgment was rendered and from which this appeal is taken.

[1] Appellant's first assignment of error is based upon the court's refusal to give special charge No. 1, instructing the jury to find for appellant for one-half of the amount of

the net profits obtained by the defendant, S. G. Carter, in the sale of the two sections of land, because under the law and the evidence appellee was obligated to represent the joint interest of himself and appellant at the foreclosure sale, and should be required to account for one-half of the net profits resulting from the resale of the property, under which he presents several propositions.

Aside from the interest held together in the notes and the judgment, we do not think it conclusive that there was such fiduciary relation existing between Evans and Carter as conclusively established the fiduciary relationship such as would have warranted the trial court in taking the case from the jury. Appellant admits that he never attempted to make any arrangements with appellee to protect his interest in the sale. He did not answer appellee's letter, and did not get the abstract requested of him, and he knew the prior lien existed and did not furnish a dollar to any one to take care of it, but he does say he made some arrangements with Madden to take care of the notes. In so far as this record shows, we think that appellant did not trust appellee to look after his interest; at least it is not conclusive that he did so. Under the charge of the court, the jury found that Carter was not representing Evans at the sale, in bidding on the property, and that he had notified appellant and his attorneys that he would not. The evidence in this case tends to show that Evans refused to recognize Carter as in any sense his partner, representative, or agent, but that he repudiated such relationship. The facts tend to show that he placed his interest in the hands of Madden, and dealt with Carter at arm's length, and in so far as could be done, annulled all fiduciary relationship between himself and Carter. Evans having so treated the relationship, we can see no duty upon Carter other than that one man owes to another. The trust relationship was repudiated by Evans long before the sale, and the evidence shows that both parties so recognized the repudiation. We recognize, where there is nothing to show a cessation of the confidential relations, that the law will require a strict accountability. After these parties ceased their business relations, there was no more duty upon Carter than upon Evans to buy in this property at public sale. Evans did not trust Carter, but put his interest in the hands of Madden by his letters and by his conduct. If Carter is to be believed, and the jury appears to have accepted his testimony, he notified Madden that if he purchased the property, it would be in his own interest, and not for Evans. The testimony tends strongly to show that there was no trust reposed in Carter by Evans, but on the contrary, Evans selected another to represent his interest, to whom it was confided and not in Carter. We are inclined to believe there are facts, if the jury accepted them,

176 S.W.—48

which take the case out of the general rule.

[2] It is insisted, however, that the evidence establishes a partnership, and under the rule, where a partner buys in an outstanding title or uses partnership funds to purchase property, that such purchase will inure to the benefit of the partnership and not to the individual so purchasing. The facts in this case do not warrant the conclusion that the amount of the bid was credited upon the partnership judgment. If the facts show that the joint judgment was so credited it would then have made no difference to whom the deed was made; it would inure to the benefit of Carter and Evans. This was not in the true sense of the word a buying in of an outstanding title by one partner to the land. It was a sale of the partnership title and interest to the land by the sheriff at public sale under an order of the court. The question therefore is: Can a partner, or a tenant in common, buy in such title when sold under order of court at public sale, for his individual use and profit? When he does so, does he hold it in trust for his cotenant or the partnership? Mr. Justice Lurton has so clearly announced what we believe to be the correct rule that we take the liberty of quoting at length from his opinion:

"But it is said that Jenner's relation as tenant in common to appellant and those associated with him as owner of the property sold to pay off this paramount lien forbid his purchase. That there is such a community interest between those who hold a common title as to forbid one such cotenant from acquiring any benefit from the acquisition of an outstanding superior title is undeniable. That a court of equity upon timely application will convert such a purchasing tenant into a trustee for the common benefit is true. The doctrine is considered and applied in Rothwell v. Dewees, 2 Black, 613, 17 L. Ed. 309, and Turner v. Sawyer, 150 U. S. 578, 14 Sup. Ct. 192, 37 L. Ed. 1189. For much the same reason one tenant may not hold adversely the common property against another, though he may do so, if he act openly, and in that event the statute will run in his favor. Elder v. McClaskey, 17 C. C. A. 251, 37 U. S. App. 199, 70 Fed. 542. But it is plain that the principle which turns a cotenant into a trustee who buys for himself a hostile outstanding title can have no proper application to a public sale of the common property, either under legal process or a power in a trust deed. In such a situation, the sale not being in any wise the result of collusion, nor subject to the control of such a bidder, he is as free, all deceit and fraud out of the way, as any one of the general public. Even a trustee has been held competent to purchase the trust property at a judicial sale, which he has no interest in, nor any part in bringing about, and which sale he in no way controls. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 329; Allen v. Gillette, 127 U. S. 589, 8 Sup. Ct. 1331, 32 L. Ed. 271.

"But it is said that if there is no absolute prohibition upon one co-owner, buying at an open sale of the common property to satisfy a mortgage or other incumbrance thereon, at least the fiduciary character and common interest due to such a cotenancy require of one who buys the utmost fairness of conduct. Concede this. It is then said that Jenner at the bidding held a power of attorney from three others of the syndicate members, by which he was to

bid the property in for their mutual benefit at the lowest price possible, and at a price not exceeding $24,000. That he held this power of attorney and had undertaken to buy at as low a price as possible was not known to appellant, and this 'secret combination,' as it is styled and designated, was a fraud upon him. It is plain from the facts of this case that the scheme for exploiting this Crescent Heights property, according to the agreement exhibited by the share certificates, had practically collapsed, and that for the want of means and harmony among the owners there was no practical way of clearing the property from incumbrances, which had turned out to be about $39,000, a sum larger than seems to have been originally supposed. There was nothing left but for the members of the syndicate to put their hands into their own pockets and put in a large additional sum or let the incumbrances be enforced. This latter is just what happened. In such circumstances it was plainly the right of each one to take care of himself, and if he saw fit to buy at the trust sale on the chance of making something, he was free to do so, provided only he took no undue or unfair advantage of his co-owners, and observed the rules concerning fairness at such a sale which prevails in any circumstances. If two or more of those who had been concerned should choose to unite their fortune in a new purchase, there was no principle of law or morals to forbid. That they should agree to buy at the best price obtainable was their right, if they might buy at all, provided they resorted to no artifice to deter others from bidding. Pewabic Min. Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887, 36 L. Ed. 732. Mr. Jenner's attitude at the sale was that of an open bidder acting in his own interest, and necessarily in opposition to that of the appellee and other cotenants. ·There were others present at the sale, bidding against him, and chief among them was the appellant himself, who, although he says he intended to give the syndicate the benefit of his purchase, said nothing of it, and seemingly sought to secure himself as best he could in the apparent wreck of the joint enterprise." Starkweather v. Jenner, 216 U. S. 524, 30 Sup. Ct. 382, 54 L. Ed. 602, 17 Ann. Cas. 1167.

The rule announced by the Supreme Court of the United States has been recognized and announced by other courts. Jackson v. Baird, 148 N. C. 29, 61 S. E. 632, 19 L. R. A. (N. S.) 591; Baird v. Baird, 21 N. C. 524, 31 Am. Dec. 399; Aubuchon v. Aubuchon, 133 Mo. 260, 34 S. W. 569; Becker v. Becker, 254 Mo. 668, 163 S. W. 865; Bennett v. North Colo. Spgs., etc., 23 Colo. 470, 48 Pac. 812, 58 Am. St. Rep. 281; Stevens v. Reynolds, 143 Ind. 467, 41 N. E. 932, 52 Am. St. Rep. 422; Boynton v. Veldman, 131 Mich. 555, 91 N. W. 1022; Hunter v. Fields (Ark.) 169 S. W. 813; Fielding v. White, 32 S. W. 1054; Niday v. Cochran, 42 Tex. Civ. App. 292, 93 S. W. 1027; Bates on Partnership, vol. 1, § 311.

Mr. Bates says that he sees no good reason why one partner may not buy in partnership property at execution sale for his individual benefit. He, however, cites authority holding the contrary. It appears to us from this record that Evans refused to take any responsibility or risk and refused to aid in any way in making the property bring the debt. Carter was required to bring the suit, pay the attorney's fees, procure abstracts and the money to discharge the previous lien, which was over $4,000. After all the burden had been so assumed by Carter, Evans demands half of the profit in the land so purchased. We think, since he was unwilling to go into his own pocket to discharge the prior lien or assist in doing so, and the other necessary expenses, and assenting to and showing a willingness that his equity in the land be sold, that·he is now in no position to say, when it was sold by order of the court publicly and openly,· with full notice to him of the time and place of sale, that Carter's purchase should inure to his benefit. By his acts he clearly evidenced a purpose not to purchase the land, or to be in any way responsible in paying the necessary charges and the prior lien thereon. We do. not believe that after Carter has assumed all the responsibility and risk, and after having solicited and implored Evans to assist him, that he should now be deprived of his profits. Evans had an equal chance with Carter to have purchased the land at public sale had he desired to do so, and no act of Carter's, so far as this record shows, prevented him from bidding on the land or from being present at the sale. The first assignment will be overruled.

The second, third, fourth, and fifth assignments are overruled for the reasons heretofore set out. We do not think under the facts of this case, the law placed the duty upon appellee to act for appellant, and that his purchase thereunder necessarily inured to the benefit of Evans.

The sixth, seventh, and eighth assignments are overruled. We believe under the facts that if Carter was acting for himself in the purchase at the sheriff's sale, and he did so openly, he was entitled to the profits of the purchase.

[3] The third special charge requested, as drawn, we think the court properly refused. It is stated that, if at the time of or prior to the sale Carter and Boulware had an understanding or agreement that Carter should purchase the property and then resell to Boulware at an agreed stipulation in excess of the amount paid, to find for appellant. Such an agreement would not necessarily render the sale illegal as to appellant. Starkweather v. Jenner, supra, and quotation therefrom. If the charge had further told the jury, if they should find that the parties entered into an agreement to stifle competition or prevent the property bringing a fair price, or to defraud Evans, etc., then we think under the facts and circumstances it should have been given. Parties may lawfully agree to buy land jointly, taking it in the name of the other. There is nothing against a party refusing to bid so long as he does not enter into a combination to stifle bids or for a fraudulent purpose. Ellerd v. Ellison, 165 S. W. 876. The charge, to have been a proper one under the facts and pleadings in this case, should have been so drawn;

as drawn, it was a charge on the weight of the evidence, singling out a part of the agreement which of itself is not necessarily illegal.

We find no such error assigned as will require a reversal, and the cause will be affirmed.