## KEYSTONE PRODUCTION CO. v. PACE.
### No. 3582.

Court of Civil Appeals of Texas. Amarillo.
June 10, 1931.

Rehearing Denied Sept. 9, 1931.

Slay & Simon, of Fort Worth, and DeMontel & Sanford, of Wichita Falls, for appellant.

Bullington, Humphrey & King and Weeks, Morrow & Francis & Hankerson, all of Wichita Falls, for appellee.

RANDOLPH, J.

This suit was brought by the Keystone Production Company of Texas against Geo. L. Pace and Western Oil Corporation, but the case was dismissed without service of citation upon said Western Oil Corporation, and trial was had as between the Keystone Production Company, hereinafter called plaintiff, and Geo. L. Pace, hereinafter called defendant. On trial before a jury and on the verdict of the jury, judgment was rendered by the court in favor of the defendant. From that judgment this appeal has been taken.

On March 14, 1928, the plaintiff and the defendant entered into a contract whereby the plaintiff purchased from the defendant an undivided one-third interest in certain oil and gas leases in Stephens county, Okl., for a total consideration of $113,294.14, of which $25,000 was in money and notes and $88,294.14 was payable out of one-half of the proceeds of oil or gas sold from the property.

It will not be necessary to describe the leases except the lease involved in this suit, which we will merely identify as the "Bush lease" and state that the portion of the total consideration of the contract applicable to this particular lease was $2,000.

The contract herein was as between Pace as the named first party and the production company as second party, and contained the following provisions, creating the relationship between the parties and imposing upon each the duties required of it and him:

"Whereas, First Party owns outright in his name, the full interest in certain oil and gas leases and part interest in certain other oil and gas leases and is endeavoring to acquire other leases covering lands located in Stephens County, Oklahoma, described and enumerated with valuation placed on each tract, attached hereto, marked 'Exhibit A' and made a part hereof, which description and prices and terms are considered in this contract and sale, and

"Whereas, First Party is desirous of selling an undivided one-third interest in and to the leases he owns in full and a one-third interest of the interest he owns in such leases in which he does not own full interest and a one-third interest in and to the full leases or interests in leases that he is arranging to acquire, and

"Whereas, said Second Party having inspected all of said leases, desires to purchase said undivided one-third interest in said full leases, interests in leases now owned and the full interests and part interests in leases arranging to be acquired,

"Now, Therefore, it is agreed and contracted as follows, to-wit:

"That the total consideration for the said interest sold and to be transferred and assigned to second party by first party is $113,294.14, $25,000.00 of this to be paid in cash as follows: $15,000.00 with the execution of this contract, $5,000.00 within ten days from date hereof, and $5,000.00 within twenty days from date hereof, said last two payments to be evidenced by promissory notes of even date herewith, drawing eight rate of interest; and the further consideration of $88,-

294.14 to be paid out of one-half of the oil or gas or either of them that is produced and marketed from said interests in all of said leases that is sold to Second Party, and further out of the sales of the full amount of interest in said leases Second Party is herewith acquiring. In case any sales of said leases are made, such payments out of the oil, gas and lease sales to continue to First Party until the balance of the full consideration herein described is fully paid.

"To effect the carrying out of the terms of the payment of the unpaid balance due First Party on the purchase price enumerated in next above paragraph of this contract, the Second Party hereby assigns to the First Party one-half of the interest herein acquired by Second Party in the oil or gas produced and saved from said leases, or any part thereof, and hereby agrees to execute proper division orders in favor of First Party for the purpose of delivering same to his credit. The Second Party hereby agrees and by this contract hereby assigns to First Party all of the proceeds from the sale of all or any part of said leases to First Party until, either from the proceeds of oil or gas produced or from the proceeds of property sales, or both, the full consideration has been paid to First Party.

"Included in said one-third interest in said leaseholds is a one-third interest in and to all personal property belonging to or appertaining to said leases for the operation of same, not including, however, any drilling equipment, all of which belongs full interest to the First Party and is not included in this sale.

"As a further consideration for this sale, it is understood, agreed and contracted, that First Party is to control all of the said properties, to do all of the drilling and operating of same, and that the drilling price to be paid for same is $2.50 per foot for the actual drilling; that the cost of derricks on locations, slush pits, water and fuel delivered on locations shall be furnished by both parties hereto, the cost of said drilling and the furnishing of said derrick, slush pits, water and fuel to be paid for rateably to the interests owned, that is, First Party shall pay two-thirds of the same and Second Party shall pay one-third of same. That all materials and furnishings, including casing, cement and cementing, tubing and rods, standardization, power, tanks, and everything incidental to furnishing and finishing the wells, placing the products into tanks, and pipe lines, shall be a joint cost, payable rateably to the interests owned, including the cost of testing of any sands, tested with Rotary drill pipe testing devices.

"It is further agreed and understood that there are several of the leases included in this sale that require drilling as a part of the original consideration for the First Party obtaining said leases, and that the Second Party hereto agrees that First Party shall proceed with said drilling requirements in order to save said leases and that the said Second Party will pay his pro rata of $2.50 per foot to the First Party as drilling contractor, and his pro rata of derricks, slush pits, water and fuel delivered at location.

"It is agreed and contracted that Second Party will pay First Party his pro rata part of said drilling and derricks on locations, slush pits, water and fuel and all materials and labor (not included in moving, setting up and operating the Rotary drilling machine) immediately when any one of said wells is finished and bill rendered covering same.

"First Party agrees to carry and maintain compensation insurance and to take all of the responsibility in his drilling operations but after well is finished in good order and workmanlike manner, the end of this responsibility ceases as a contractor.

"It is agreed that First Party is to have full charge of making locations and drilling such wells as he deems fit or that may be required to hold the leases or to protect them from offset drilling wells or producers, and that, likewise, said First Party shall have full and complete charge in handling all of the said leases when production is obtained thereon, however, that said Second Party shall have the right to, at any and all times, inspect any and all work and drilling and operating of said properties, including the method of doing said work and cost thereof, and the accounting for all of the expenses of same.

"It is agreed that both parties will endeavor to sell at different times a part or all of the properties at a fair value and at the best prices obtainable, and to the best advantage to both parties hereto, and that in case one party deems it advisable to sell any one of the properties or all of same, that he shall communicate any prices made for any such properties to said other Party before sale is made and said other party will be privileged to buy same at the price and terms submitted by First Party or a bona fide buyer.

"It is further agreed and understood that, the price, terms and conditions and deliveries considered, First Party will endeavor to purchase all materials and equipment for operating his drilling rigs, developing and maintaining the leases from Second Party, it being understood that Second Party shall be entitled to make a profit on same, but that his prices must be in accordance with prices of other supply houses for like merchandise.

"First Party agrees that in the handling of the development and operating of said leases, that he will use every effort to do so as economically as good work and material will justify.

"It is agreed that pipe line division orders covering any and all of said leases on which production may be obtained, will be duly executed in favor of both parties hereto, pro rata to the interests owned, except that as long as any unpaid balance is due First Party, of the purchase price and consideration, one-half of the Second Party's oil or gas run settlements will be paid direct to First Party by the purchasers of any such oil or gas, but when said balance of purchase price consideration is paid, then said Second Party will be entitled to and shall receive direct settlement for his full interest from said purchasers of oil and gas. This will also cover lease sales or personal property, that is, after all of the purchase price consideration is paid, Second Party's part of any lease sales shall be paid direct to them by the purchaser.

"It is agreed that there are certain properties listed and valued herein that First Party does not own the full interest to and he may not be able to deliver a one-third interest as contracted herein, and in that case, the Second Party will only buy and pay for one-third of the interest that said First Party may own or acquire, and that the purchase price consideration will be duly credited with such value as listed under Exhibit 'A' of any piece of property that he has failed to deliver covered under this contract; that said credit will apply on the unpaid balance and not the original cash and note consideration of $25,000.00.

"It is further agreed that the First Party will deliver to Second Party abstract of title covering any and all of the said tracts covered in this sale, together with all of the attorneys' opinions that he has on hand, and that said Second Party is privileged to have said titles examined at his own cost and that if the title to any piece of property is found defective and such defects cannot be or are not cured by First Party, then Second Party may transfer the interest being purchased in said particular property back to the First Party and shall have credit for the value at which said property was sold and listed under exhibit 'A' on the balance of the purchase price consideration, however, the decline or advance in value of any of said leases by development in the field shall not be cause for claim of credit on any one of said leases.

"Proper assignments and transfers to the interests purchased in all of said leases shall be delivered by First Party to Second Party.

"It is agreed that if other leases or royalties in the vicinity of the properties in this contract, are known to be valuable at prices and terms that either party considers attractive, that he shall notify the other party and if said other party desires and shall put up his part of the purchase price at the time said purchase might be made, said properties will be owned, if so purchased and paid for, two-thirds interest to First Party and one-third to Second Party."

The plaintiff assigns as error the trial court's refusal to instruct the jury peremptorily to return a verdict in its favor, "for the reason that the evidence conclusively showed the written contract between the parties to the suit, by the terms of which the plaintiff was the owner of an undivided one-third interest in the lease here in question and by the terms of which plaintiff and defendant were partners in said lease, and it was the duty of the defendant to drill wells on said lease so as to protect the mutual interest of the parties, and the evidence was uncontradicted that the parties were in such relationship of trust and confidence that the defendant was in duty bound to protect the plaintiff in its interest in the jointly owned property and therefore showed conclusively that the defendant was precluded by the relationship between the parties from attempting to deprive the plaintiff of its interest in the jointly owned Bush lease, and to the exclusion of the plaintiff, a new lease or extension lease covering the said property, and therefore conclusively showed that the lease on the Bush land claimed by the defendant Geo. L. Pace was, in fact, at the time of its acquisition and now is, owned as to an one-third interest therein by the plaintiff, and the jury should have been instructed to find for the plaintiff for one-third interest in said lease and for the sum of money shown by the undisputed evidence to have accrued from the oil produced from said one-third interest, less the expense of development and operation."

We cannot conclude from the record that the "undisputed evidence" sustains plaintiff's above assignment. On the contrary, the evidence is very much "disputed" and conflicting. The Bush lease was included in the original lease and therefore came under the terms of the partnership between plaintiff and defendant. The Bush lease covered forty acres of land and required the drilling of four wells. It appears that the defendant seasonably began the drilling of one of the wells, but that this well was lost at an approximate depth of 1,400 feet. The defendant immediately moved his drilling rig about 50 feet north of the first location and began drilling a well and continued same to a depth to fully test out the producing sands in the vicinity, which were above a depth of $1,700 feet, and in said second well salt water was struck.

The defendant, in answer to the claim of plaintiff (Horwitz Bros. being the owners of the plaintiff company) that the Bush lease, at the time it was developed under its renewed lease to the defendant, and the proceeds therefrom, belonged to the partnership between the plaintiff and defendant, contends that the relationship of partners had terminated on

October 30th, so that there was no obligation upon the part of the defendant to allow the plaintiff an interest in subsequently acquired leases. Defendant further contends that the plaintiff (Horwitz Bros.), forbade him from further drilling on the Bush lease, and that it by its acts terminated said lease and the partnership between the parties. To support this contention the defendant testified as follows:

"We had pretty well caught up with our drilling, and I wanted to put a Star machine there and see what we could do with it, and drill another well on it. He said that I had drilling rigs and wanted to drill all the time, that I wanted to drill more than he because I had the rigs, and he did not want to drill any more on the Bush lease; that he had investigated it and did not think it was worth it; so, after he made the complaint and investigation, he did not think there was a chance to make a well of it and did not want to spend any more money. That was about 60 days after the first well was drilled, in July or August.

"They (Horwitz) refused to drill it before it did run out, and after it run out I asked them to come back in and they wouldn't.

"At the time the Bush lease was acquired, there was a producing well on the Allen tract adjacent, but there had been three dry holes drilled around the lease, and there were three more between our Bush lease and our production on the south and east. There were several dry holes between the Empire lease and the production on the northwest and the Bush lease.

"After we acquired the Bush lease on March 8, 1928, or contracted to acquire it by drilling four wells on it, and before I made the contract with the Keystone Production Company, we had drilled the Allen well, 400 feet east of the Bush lease, a little deeper and it was making more production—it was bigger than it came in at. The original contract with Mr. Bush provided that I should begin a well 30 days after the date of the lease, which would be on or about April 8th. I started that well in compliance with the contract. The head driller was E. N. Keowen, or 'Pewee' Keowen; it was my rig and I was the contractor, but Keowen was the head driller, and had actual charge of looking after the drilling of the well. Mr. Frank Pace, my nephew, Mr. Floyd Jones, production superintendent for the Keystone Production Co., and I, all, would confer on matters and were looking after it.

"The general horizon of the production there is about 1630 feet, where we were due to strike the Comanche sand. I contracted to go 1800 feet or to oil and gas in paying quantities at a lesser depth. After we started the well, we went down with it, diligently proceeding to test the Comanche-Duncan sand

at 1500 to 1600 feet, but the first hole we lost around 1500 feet. That was my loss, and I moved over and began another hole, went right down with it, and found a showing of oil in the proximity of the depth that the general horizon of oil was. We made an effort to save that well; set pipe, cemented and drilled out the cement later when it had set. We did everything that we knew to do, in the light of our experience and as an operator, to save that first well. I had a two-thirds interest and the Keystone Production Company had a one-third interest in the lease. We drilled down to 1680 feet and at that depth we had gone through the possibility of the sand. I think there are some wells in that country, quite a piece from this property, where oil has been found below the depth of 1680 feet or below the Duncan sand at 1800 feet, but not in that immediate area. It would not have taken a great deal of expense to have pushed that well down to 1800 feet; it would have taken some risk; it wouldn't have been an awful lot of time if we had not been looking for sand.

"We completed this well to our satisfaction and the satisfaction of the drillers, as a salt water well, on May 9, 1928. We drilled the well at the particular location that we did because that was closest to production. We had the Allen well producing there 450 feet to the east. The well stayed there for a while after we set the casing, because we wanted to move a Star rig on there and test it out a little further. We set the casing, cemented and let it harden, and then drilled it, swabbed it out, and tried to make a well of it for a few days, and not knowing exactly what to do with it and needing the rotary rig on another lease, we moved the rotary rig off. After we let it set there awhile, we consulted Mr. Horwitz two or three times about moving the Star rig back on the lease. At first both he and I were undecided. We thought it would be a very good idea to do that, but we could not get up there with the Star machine at first, it had work. At a later date when the Star machine was available, he did not want to spend any more money on the Bush lease. I wanted to carry out our contract with the land owner, Mr. Bush, and I thought that there was a fair chance of making a well there at some greater depth.

"Mr. Bush is an old gentleman, about 75 or 76, I think. I talked to him several times about the lease. He wanted us to do something, if we were going to, about drilling his lease. He said he had given it to us, practically, and he wanted it cancelled or drilled. He said that we had not finished our contract on the first well by drilling to 1800 feet. I told Mr. Horwitz what Mr. Bush said, and I told him that I would either have to go back and continue the well on down to 1800 feet in order to comply with the contract

with Mr. Bush, or I would have to drill another well. Mr. Horwitz replied that we had better leases to drill and never at any time agreed or consented to my going back and drilling that well down to 1800 feet or drilling another well—he said that the lease was no good and he did not want to spend the money. He told me that he was going to check up on the lease himself and see what was the prospect of this particular well making a well, or other locations being any good on the lease. He told me about that well to the west on another lease; it seems that he had a map that showed a lot of dry holes around and said that he did not think it was any good—rather surprised that we drilled such a lease in the first instance. When he said that, I told him that in that country when you have showings, often you can get a well a little piece away; that had been my experience—where there are showings, in that field, ofter near it you get production. That was the argument I advanced to get him to go back, but he said that we had better leases and that he did not want to spend any more money on this lease. From the time we completed this well up to October 15, 1928, I had conversations with both Mr. I. E. Horwitz and Mr. William Horwitz concerning the drilling of the lease. He and Mr. Keynon, the driller who drilled the first well, investigated it and other sources, and then he told me that he would not spend a dime on that lease.

"During the spring and summer of 1928, from the time I sold to him, we were getting good wells to the southeast of this property; some of the leases two and a half miles southeast were making some nice wells—we had brought the production up to around 1000 barrels a day, and we started out with around 100 barrels.

"From the time we finished the well up to between 1600 and 1700 feet up until October 15th I talked to Mr. Horwitz several times about getting him to help drill the Bush lease—six or seven, maybe eight conversations. I remember the last one he said, 'I am tired of you mentioning that Bush lease.' That was about October 15th.

"When the Magnolia made their location at an offset to this lease on the north, along in October (although the derrick stood here some two weeks before they had a drilling rig on it), that was about when I first learned the Magnolia was going to drill the well, and after that I made another effort to get Mr. Horwitz to go in with me and develop the Bush lease; I carried him over and showed him the derrick; I believe that they were rigging up on it that day. I told him that the Magnolia, with the showing that we had on No. 1 Bush, justified another location over there; that in that country where you had these showings, you would often get a well, that had been my experience in the

field as well as other drilling contractors. He looked around some. He had a map probably my Heydrick map, published in Wichita Falls, and he talked about the dry holes down south and others in the northeast and he said 'we will get a dry hole' and then, 'I do not want to spend any more money on this lease, and I won't.' It was either then or a day or two afterwards he said, 'I am tired of hearing about the Bush lease.' After he told me that, I did not talk no more; I thought that was enough; he told me to let him alone. After Mr. Horwitz told me he did not want me to talk to him about it any more, I tried to get others to help drill that lease. I would have preferred having Mr. Horwitz help drill it to some one else, because I had other leases with him. I think I tried to interest three or four other people in the drilling of the lease after that—I think I made myself a nuisance over there—and I finally interested Mr. Joseph L. Martin, of the Van Mex Oil Company, in assuming a portion of the obligation in the drilling of the Bush lease. He consented to help me drill the Bush lease before I made a sale to him of my whole properties—or kinder simultaneously with the deal."

This evidence was corroborated by the testimony of other witnesses. While the Horwitz' evidence conflicts with this, it certainly does not render the defendant's testimony "undisputed."

█ The defendant sold his two-thirds interest in the partnership properties and terminated the partnership relation with the plaintiff. The question, therefore, remains, While the partnership between Pace and the plaintiff (Horwitz) existed, did Pace, the defendant, acquire information or knowledge of the value of the Bush lease which he did not communicate to his partner, the plaintiff, and which it was his duty to have disclosed? It is apparent from the record that the facts testified to by the defendant authorized the jury to find that the plaintiff had every reasonable opportunity to join with the defendant in the development and operation of the Bush lease and that it declined to do so because of the cost of such development. No legal or equitable duty was therefore breached by the defendant in his conduct toward his partner as to such lease and there was no concealment of any fact tending to show a peculiar value of the Bush lease which was known to the defendant and unknown to the plaintiff, or which was concealed from plaintiff by the defendant.

Among other findings of the jury are the following, which are abundantly supported by the evidence: That the Keystone Production Company, after the drilling of the first well on the Bush lease, abandoned the lease and lease contract on same; that Geo. L. Pace, after such abandonment, advised I. E. Horwitz of

the Keystone Production Company that he could secure another lease from L. L. Bush, conditioned upon certain drilling obligations; that said Horwitz refused to join in securing such lease; that said Horwitz refused to join in the drilling of further wells on the Bush lease; that Pace advised I. E. Horwitz, plaintiff's general manager, that the landowner, L. L. Bush, would execute another lease on the land in question, provided other wells were drilled thereon; that this information was furnished I. E. Horwitz several times before the defendant secured the second lease from Bush to himself and before he drilled the additional wells drilled on said Bush lease; that Pace requested Horwitz to join with him in the drilling of said wells and that said Horwitz refused to join him in the drilling of same; that L. L. Bush, the owner of the land, terminated the original lease at the end of a verbal extension of same and that I. E. Horwitz, acting for the Keystone Production Company, acquiesced in same; that said Horwitz, acting for said production company, notified Geo. L. Pace that it would not consent to do any further drilling on the Bush lease— all of which appears to have occurred prior to Pace's securing his second lease from Bush.

It appears, therefore, that, the original lease having been abandoned and terminated, the defendant, Pace, secured a lease from Bush, the owner, to himself, and proceeded to the drilling of additional wells thereon. The plaintiff then brought this suit against Pace to recover the title to said lease and for the proceeds of the oil from same.

■ Where there is evidence before a jury to warrant an answer to special issues, the trial court has no authority, and neither have we, to set aside their finding, even though the evidence is strongly contested. Lee v. I. & G. N. Ry. Co., 89 Tex. 583, 36 S. W. 63; Paternostro v. Bradley (Tex. Civ. App.) 262 S. W. 896; City of Hillsboro v. Jackson, 18 Tex. Civ. App. 325, 44 S. W. 1010; Lancaster v. Browder (Tex. Civ. App.) 243 S. W. 625; Westchester Fire Insurance Co. v. Biggs (Tex. Civ. App.) 216 S. W. 274; Hoot v. Walker County Lumber Co. (Tex. Civ. App.) 219 S. W. 544; Grice v. Herrick Hardware Co. (Tex. Civ. App.) 219 S. W. 502; O'Fiel v. Janes (Tex. Civ. App.) 220 S. W. 371.

There are many propositions and assignments of error, but the proposition we have discussed is the paramount question in the case and controls its disposition. We have considered the many other assignments, and those questions that do not come within the limits of the assignment discussed are either immaterial or present no reversible error. We therefore overrule all assignments and propositions and affirm the judgment of the trial court.