**GIDDINGS CONVALESCENT HOME, INC., et al., Appellants,**

v.

**Rogers D. WILSON et al., Appellees.**

**No. 11847.**

Court of Civil Appeals of Texas, Austin.

Oct. 27, 1971.

Rehearing Denied Dec. 1, 1971.

Johnson, Jones & Sheppard, Samuel D. McDaniel, Salmanson & Smith, Allen E. Smith, Austin, for appellants.

Baker, Watkins, Ledbetter, Hayden & Ramsey, Thomas H. Watkins, Austin, for appellees.

O'QUINN, Justice.

Appellants brought this suit for actual and punitive damages and, alternatively, to enforce a constructive trust on certain property in Giddings, Texas. Appellants abandoned their contract theory and went to trial before a jury on the theory that a constructive trust grew out of breach of a fiduciary duty by Rogers D. Wilson, one of the appellees.

Upon a jury verdict favorable to appellees, the trial court entered judgment that appellants take nothing.

We affirm the judgment of the trial court.

Eric K. Palmros, Sr., and his son, Eric K. Palmros, Jr., entered into a joint venture with Rogers D. Wilson to construct and operate a convalescent home in Giddings, Lee County, Texas, early in 1966. Palmros and his son agreed to find a site for the building and to supervise the construction work. Wilson, who was experienced in the operation of convalescent homes, agreed to manage, or supervise management of, the completed home. The parties agreed that the project would be owned fifty percent by Palmros and his son and fifty percent by Wilson.

In March of 1966 the parties organized Giddings Convalescent Home, Inc., as a vehicle for their project, with Palmros and son holding half the stock and Wilson holding half. Directors of the corporation were Palmros and his son and Wilson.

A commitment for permanent financing had been obtained by the parties from the First National Bank of Giddings, with interim financing by the Fort Worth National Bank. A condition of the commitment letter was that the permanent loan be guaranteed personally by Wilson and by the elder Palmros. Construction of the building was substantially complete by the middle of October in 1966.

Late in September or in October Wilson asked Palmros and son to agree to an increase in the number of directors of the corporation to four and to let Wilson name the fourth director. The purpose of this proposal was to accord equal control as well as equal ownership of the project. The suggestion was rejected by the Palmroses. Wilson resigned as a corporate officer and director of Giddings Convalescent Home, Inc., and tendered his interest in the project. Wilson also advised Palmros and son that he would not enter into the upcoming permanent loan arrangements by personally guaranteeing the debt. All parties considered their relationship as joint venturers to be at an end.

Wilson later told the Palmroses he would buy them out if they would sell. The Palmroses first asked $25,000 for their interest and later raised that figure to $44,800. In either case, Wilson was to assume payment of the interim financing note of $81,835. Wilson declined to buy on either basis. Some time later the elder Palmros advised Wilson he would sell the Palmros interest for $91,500 if they could keep a fifty percent interest in the project, or would sell for $96,500 and not keep an interest. Again Wilson refused the offers, and afterwards, about a week before the property was sold at foreclosure sale, informed the Palmroses that he intended to bid individually on the property at the sale.

After the interim financing became delinquent, the First National Bank of Giddings declined to make the permanent loan without compliance with the commitment calling for the personal obligation of both Palmros, Sr., and Wilson. At the trustee's sale, early in December, Wilson bought the property for $91,172.77, which was sufficient to discharge all debts against the project. Neither of the Palmroses appeared at the sale and did not bid on the property in person or by agent. Following his purchase of the property, Wilson organized Giddings Nursing Home, Inc., and conveyed the property to the corporation. Wilson, at the time of trial, was operating the nursing home through his corporation, an operation the record shows to be successful.

The jury failed to find, in response to special issue No. 1, that Wilson "entered upon a plan to cause Giddings Convalescent Home, Inc., to become unable to acquire its permanent financing in order to cause the corporation to suffer a foreclosure thereby giving Defendant Wilson the opportunity to buy at foreclosure." Both Palmros, Sr., and his son testified that Wilson had done nothing to prevent either of them from buying the property at the trustee's sale, but that neither of them attempted to buy the property, either as individuals or as officers of Giddings Convalescent Home, Inc.

The jury also found that Wilson acted in good faith in not personally guaranteeing the note for permanent financing and in purchasing the nursing home property at the foreclosure sale.

█ A joint venture has been described as a limited or special partnership engaged in the joint prosecution of a particular transaction for mutual benefit or profit. Holcombe v. Lorino, 124 Tex. 446, 79 S.W.2d 307 (1935). Like a partnership, a joint venture may be brought to dissolution or termination by the participating parties. Wilson terminated the joint venture early in October, 1966, when he told the Palmroses he would proceed no further with the nursing home project, would not obligate himself on the permanent financing, and resigned as an officer and director in the corporation they had set up.

The Palmroses agreed that the joint venture had come to an end. Wilson told the Palmroses they could have his entire interest in the venture, but that if they wanted to sell to him, he would consider buying. Later, in advance of the trustee's sale, Wilson made known to the Palmroses that he intended to bid at the sale and buy the property if he could.

Before a constructive trust will be impressed upon property acquired by one of the joint venturers, it must be shown that the partner who bought the property took advantage of the confidential and fiduciary relationship existing with his joint venturers in making the purchase. See cases annotated in 44 A.L.R.2d 520. The principle, as applied particularly to situations in which the joint venture or partnership has been dissolved and all parties are free to act individually, has been followed in Keystone Production Co. v. Pace, 41 S. W.2d 731 (Tex.Civ.App., Amarillo 1931, writ ref.); Collins v. Gee, 107 S.W.2d 754 (Tex.Civ.App., San Antonio 1937, writ ref.); Evans v. Carter, 176 S.W. 749 (Tex.Civ.App., Amarillo 1915, no writ).

We find nothing in the record to show that Wilson at any time, either before or after termination of the venture, withheld any fact from his joint venturers or after dissolution of the joint arrangement concealed from them his intentions with respect to acquiring the property for himself, or that he ever did anything to prevent the Palmroses as individuals, or as officers acting for their corporation, from attempting to acquire the property at the sale. The price Wilson paid for the property was sufficient to discharge all debts and charges against the property and was in keeping with the value conceded by the Palmroses to be represented in the project. The day following the sale to Wilson the elder Palmros reported to his son by letter that Wilson had bought the property, giving a breakdown of the items amounting to the purchase price of $91,172.77, and added, "This got me off the Fort Worth National Bank note, for which I am very happy." As was said in Collins v. Gee, supra, " * * * appellee having repurchased the property at his own risk and with his own resources, appellants are not entitled, after waiting until the venture proved fruitful, to require appellee to share the profits of his investment with them."

The judgment of the trial court is in all things affirmed.

Affirmed.